

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00151-CR
_____


CLIFTON ALLEN, JR., Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 53,869-B



Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

Clifton Allen, Jr., pled "not guilty" to indecency with a child, L.C.,[1] by sexual contact, a second-degree felony, *see* TEX. PENAL CODE ANN. 21.11(d), and the trial court denied his motion to suppress. The trial court found Allen guilty and sentenced him to twenty years' imprisonment.[2] On appeal, Allen claims the trial court erred in failing to grant his motion to suppress; the evidence was legally insufficient to support his conviction; and the trial court erred in admitting evidence of extraneous offenses. Because we determine each of these issues against Allen, we affirm.

## I.     Factual and Procedural Background

Allen was charged with engaging in sexual contact with L.C., a twelve-year-old child, at a small church in Longview in July 2018. Allen was a deacon at the church, and the contact between Allen and the child occurred during time periods when Allen was charged with watching L.C. and other children in the church's kitchen area while the children's families attended Bible studies and prayer meetings.

Officer Debra Stiles, a crimes-against-children investigator with the Longview Police Department, began working the case in September 2018. After outcries were made by three children during interviews, Stiles conducted interviews of a number of people as part of her

---

[1]We use pseudonyms or relationships for minor children involved in this case and their family members. *See* TEX. CONST. art. I, § 30(a)(1) (granting a "crime victim . . . the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3).

[2]In companion cause number 06-24-00152-CR, Allen appeals his conviction for indecency with a child by sexual contact regarding a second child younger than seventeen years of age. With respect to a third child, in companion cause number 06-24-00153-CR, Allen appeals his convictions for indecency with a child by sexual contact and aggravated sexual assault of a child younger than fourteen years of age.

2

investigation, including Allen. Stiles interviewed Allen in her office on November 28, 2018, with Allen coming in of his own free will. Allen was neither under arrest nor detained at any time during the interview with Stiles. Allen did not admit to the allegations of sexual contact with the children during his interview with Stiles.

In late 2018, Stiles brought in Officer Rusty Hughes, a special agent with the Criminal Investigation Division at the Texas Department of Public Safety, to assist with the investigation due to his experience as a polygraph examiner. Stiles arranged for Hughes and Allen to meet on December 18, 2018. As during the interview with Stiles, Allen was neither under arrest nor detained during his interview with Hughes. Ultimately, Hughes did not administer a polygraph examination. During the interview, although Allen claimed several times that he did not remember things, he admitted to touching the children.

Allen later waived his right to a jury trial and pled "[n]ot guilty" to the charge of indecency with a child by sexual contact with respect to L.C. During the bench trial, the trial court considered Allen's motion to suppress the recording of his interview with Hughes. The trial court denied Allen's motion and admitted the recording into evidence. At the conclusion of trial, the trial court found Allen guilty and sentenced him to twenty years' imprisonment.

## II. Motion to Suppress

In his first issue, Allen claims the trial court reversibly erred in failing to suppress his statement entered into evidence at trial as State's exhibit 10, the recording of Allen's interview with Hughes.

### A.    Standard of Review and Applicable Law

"A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion." *Irsan v. State*, 708 S.W.3d 584, 609 (Tex. Crim. App. 2025) (parenthetically quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). "When reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review." *Ochoa v. State*, 707 S.W.3d 344, 360 (Tex. Crim. App. 2024). "The trial court is the sole trier of fact and judge of the witnesses' credibility and weight to be afforded their testimony." *Id.* "Accordingly, we defer almost totally to a trial court's determinations of historical fact, so long as such determinations are supported by the record, as well as to its rulings on mixed questions of law and fact that hinge on credibility and demeanor." *Id.* "We, however, review *de novo* the trial court's rulings on pure questions of law or mixed questions of law and fact that do not hinge on credibility or demeanor." *Id.* "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Id.* (quoting *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023)). "The trial court's ruling on a motion to suppress will be reversed only if it is arbitrary, unreasonable, or outside the zone of reasonable disagreement." *State v. Heath*, 696 S.W.3d 677, 689 (Tex. Crim. App. 2024).

As was the case in *Ochoa*, the trial court here entered no factual findings. *Ochoa* stated that the lack of findings "appears to be in error," *Ochoa*, 707 S.W.3d at 360, because "where a question is raised as to the voluntariness of a statement of an accused," TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Supp.), the "trial court is required to make written findings on the

4

admissibility of an oral statement," *Ochoa*, 707 S.W.3d at 360 (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6). Nonetheless, neither party has suggested that the appeal be abated for the purpose of having the trial court enter findings, likely because, as in *Ochoa*, the complained-of statements are contained in the recorded interview. *See id.* The facts surrounding the admission of the recorded interview are uncontested. "When there are no written findings from the trial court, we may infer the necessary findings that would support the trial court's ruling if the record (viewed in light most favorable to the ruling) supports these implied fact findings." *Id.* (citing *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013)).

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion" and further adheres to additional statutory mandates. TEX. CODE CRIM. PROC. ANN. art. 38.21.

### B.     The Interview

Allen's mother and father brought him in for the interview with Hughes. Allen was not detained and was not in handcuffs, and it was explained to him that the door was unlocked, he was free to leave at any time, he was not being held against his will, and his being there was completely voluntary. Allen indicated he understood those conditions.

Hughes and Allen talked very informally about their lives, but not about the allegations against Allen, for about the first thirty minutes of the interview. At that point, Hughes represented to Allen that polygraphs work by recording the body's involuntary reactions to the matter being discussed. Hughes then told Allen that they would go through a polygraph consent form together. Hughes told Allen the consent form was completely voluntary and said he was

5

not going to read Allen his rights because he was not under arrest. Allen nodded his head in agreement or understanding as Hughes said those things to him and continued nodding when Hughes asked whether he understood. Hughes soon stopped and asked whether Allen had any questions up to that point, and Allen indicated he did not.

Hughes later showed Allen the online polygraph examination consent form on his computer screen, and he and Allen read through the consent form together. The form included the following:

> I hereby voluntarily consent to allow a Texas Department of Public Safety examiner to administer a polygraph examination to me . . . . I voluntarily consent to the examination of my own free will and state that no duress, threats, or coercion have been placed upon me to take the examination. I have not been promised anything of value, reward, or immunity to induce me to consent to this examination. I understand that I have the right to stop my polygraph examination at any time I desire. I understand the results of my examination will be available to the Texas Department of Public Safety and I do authorize the Department to disseminate criminal information acquired from the polygraph examination to other law enforcement agencies for criminal investigative purposes.

Allen signed, indicating he was willing to take the examination.

Thereafter, rather than proceeding with a polygraph examination, Hughes asked Allen about the allegations made by the children. For some time, Hughes and Allen discussed the children who made the allegations and their relationships to Allen, his family, and the church. After about another half hour, the following exchange took place:

Hughes:     I want you to be 100% honest with me. Did you touch that girl?

Allen:     [Brief stuttering]

Hughes:     In a sexual way, did you touch that girl?

6

Allen:          Naw, I might have touched her in that place, but not in a sexual way.

Hughes:        You may have touched her in her vagina but not in a sexual way?

Allen:          Naw.  Like if they're jumping on me or something like that, I might have grabbed them or something like that, but I wasn't.

Hughes:        Now, be honest with me.  I can help you out as long as you're honest, but if you're withholding information or not honest, we've got a problem.

The interview continued, and Hughes asked Allen whether he thought the children he touched would be angry when they grew up and reflected back on those incidents.  Allen responded, "I don't think they'll be angry 'cause, I mean it wasn't, I mean I don't know where it got blowed up at, is what I'm saying."  Hughes explained that the children were saying the touches were deliberate, not accidental.  Allen said, "I mean, like grabbing them on the butt and touching between the legs, I didn't aim for that.  Naw.  I mean, like I said, if I did it, I did it, but I wasn't aiming on, you know, like grabbing like that.  I wasn't aiming for that."  Hughes asked whether Allen remembered ever touching any of the girls' vaginas out of curiosity.  Allen responded, "Not out of curiosity, naw.  Like I said, I probably touched them, but I didn't touch them, I didn't touch them in a sexual motivation way."

Hughes again told Allen to just tell the truth.  Hughes said, "I'm not going to go out here and talk to your family about anything we talked to.  This is all confidential.  I'm not gonna do that.  So, anything, anything that happened or anything that needs to be talked about, just feel free to speak about it, okay.  Don't hold anything in."

Allen continued to admit possibly touching the girls but continued to deny that he did so in a sexual manner. Allen said he did not even want to be home with his children because people were saying he was doing things with his own children. Allen said his accusers put it on his mind because they brought it up.

Later, about two hours into the interview, Hughes told Allen, "I'm going to believe everything you tell me until your body tells me that you're not telling me the truth." Hughes said regarding the polygraph exam, "If you fail this thing and you don't provide any explanation as to what happened, they're just going to believe what they believe. . . . I want to give you every opportunity to pass this test."

Hughes said later, "You've admitted you touched them, but you're saying it wasn't in a, for a sexual purpose." Allen replied,

> I don't know how to say it 'cause it don't sound right for one. You know, I don't know how to, I don't even know even how to digest it, really. But, if I say I touched them then I'm saying to myself, hey, you, you touched them kids. And because I know I touched them, but then if I say on the test that naw, I didn't touch them, these kids, then it's over with.

Hughes told Allen, "The only way you'd fail the test is if you touched them for a sexual purpose." Hughes again encouraged Allen to tell the truth and told him that he was not going to go out of there and tell people what they had talked about, that he was not going to tell Allen's parents what they were talking about.

Hughes soon said to Allen that he believed Allen knew he had those bad thoughts in his mind, and he felt bad about it and knew he should not be thinking those things. Hughes said, "And there was a time or two when you did touch probably one of these girls and you did it

8

probably intentionally, but you didn't mean nothing by it, it's just—you know, it just happened. Am I right or wrong?" Allen responded, "You're probably right." Hughes asked, "Probably?" Allen responded, "You're right."

Allen later said he did not fantasize about the girls; he just touched them. Allen said it only happened maybe once. Allen said in the following exchange that he was "pretty sure" he did get aroused when he touched the girls:

> Hughes: Did you get an erection? Or, did you kinda feel something you know when you touched them, kind of a, kind of a nice feeling, kinda give you a little bit of an arousal when you touched them?

> Allen: . . . . You know what I'm saying. I'm pretty sure, I'm pretty sure I did.

Hughes called Stiles to come to the interview. Hughes told Allen, "Just be real open, real honest with her like you have been with me." Hughes again said, "I'm not going to go out there and talk to your mom and dad. I'm not going to be talking to your wife. This is just between us." Hughes continued, "Based on what you've told me and where we're at now, there's no need in taking that test. Do you agree?" Allen nodded yes. Hughes then said, "Cause you wouldn't pass it, not based on what information we've shared. . . . What are you thinking now, are you scared, how are you feeling? Allen responded, "Everybody probably knew I touched them anyway."

After a few more minutes, Stiles entered the room. Speaking to Stiles, Hughes said,

> I'll let him tell you, but just in a synopsis version, there was some touching that occurred between he and these girls and at first it wasn't really something that maybe he did intentionally, but it happened. And then maybe curiosity or something--he really can't explain it, then he kinda would take the opportunity to

9

do it after that where he would touch them when he had the opportunity. But it didn't start out that way. Am I right, is that right?

Allen responded, "Yeah."

### C. Analysis

Allen argues that his statements were involuntary because they were made in response to "Hughes' promise of confidentiality," which "overbo[re] the will" of Allen, "inducing him to say something that ordinarily someone would not say."

"[F]or a promise to render a confession invalid under Article 38.21, the promise must be positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *see Ochoa*, 707 S.W.3d at 363 (stating that untrue assertions that "d[o] not rise to the level of an express promise of favorable treatment in exchange for Appellant's confession" "may be perfectly acceptable in many cases"); *Harty v. State*, 229 S.W.3d 849, 856 (Tex. App.—Texarkana 2007, pet. ref'd) ("The promise must be: 1) of some benefit to the defendant, 2) positive, 3) made or sanctioned by a person in authority, and 4) of such character as would be likely to influence the defendant to speak untruthfully." (quoting *Sossamon v. State*, 816 S.W.2d at 340, 345 (Tex. Crim. App. 1991))). "Whether the statement was obtained by coercion or improper inducement must be determined under the totality of the circumstances." *Harty*, 229 S.W.3d at 855 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Haynes v. State of Wash.*, 373 U.S. 503, 513 (1963); *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App.

10

1997)). We consider Allen's argument, then, in the context of the totality of the circumstances of his interview with Hughes.[3]

Allen had been accused of improper contact with several children while they were in his care at church. Allen came to meet with Stiles voluntarily. Stiles conducted an approximately two-hour interview with Allen during which he did not confess to inappropriate contact with the children.[4]

The challenged interview, Allen's interview with Hughes, was significantly shorter than the excluded interview Allen points to in *State* v. *Cielencki*, 706 S.W.3d 634, 637 (Tex. App.—Austin 2025, pet. ref'd). The *Cielencki* interview was approximately eight hours long, followed immediately by a two-hour polygraph examination for a combined time of approximately ten hours. *Id.* Allen argues that, when making the comparison to *Cielencki*, we should include both his interview with Stiles and his interview with Hughes. Allen, though, has not complained on appeal of the admission of the recorded interview with Stiles. While Allen's interview with Stiles is properly considered within the totality of the circumstances for all voluntariness purposes, we note regarding duration that the two interviews were almost three weeks apart.

---

[3]In a footnote, Allen asserts, without citation, that "[t]he [interrogation] videos of Appellant depict someone whose will was not strong enough to prevail against the repeated insistence of his interlocutors at getting the result they wanted." We consider that as an argument included within and in furtherance of Allen's challenge to the voluntariness of his confession. In the same footnote, Allen questions the conclusion of a Ph.D. psychologist who opined that Allen was competent to stand trial. To the extent, if at all, that amounts to an appellate challenge of the trial court's competency finding, it is unavailing. The recording was before the trial court when it rendered judgment against Allen, plus, the trial court had the benefit of observing Allen as he testified during trial. The trial court's judgment infers that it found Allen to be competent to stand trial. We will not substitute our judgment for that of the trial court in its determination of Allen's competency. *See Timmons v. State*, 510 S.W.3d 713, 718 (Tex. App.—El Paso 2016, no pet.). Nor do we determine that the trial court abused its discretion in determining Allen to be competent to stand trial. *See id.*

[4]Allen does not complain of the admission of his interview with Stiles.

11

Further, the interview with Stiles lasted about two hours and eleven minutes, while the interview with Hughes was about two hours and forty-two minutes.

As recounted in the summary of Hughes's interview above, Hughes proposed that Allen take a polygraph examination before Allen admitted to anything. No exam was administered, though. Regarding voluntariness, we consider the possibility that a polygraph examination might be administered in the totality of the circumstances. We do not, however, draw an inference from that to the truth or falsity of the confession itself. *See Ex parte Bryant*, 448 S.W.3d 29, 40 (Tex. Crim. App. 2014) (orig. proceeding) ("Polygraph evidence is generally excluded from courtrooms because the reliability of such tests remains unproven and jurors could attach undue credibility to a test that purports to sort truth from fiction, a role for which a factfinder is more properly suited.").

We turn then to Allen's complaint regarding the promise of confidentiality.

Allen had admitted to having touched the children before Hughes made any promise to him regarding confidentiality. At that point, though, Allen denied that the touching had any sexual purpose.

Thus, it was after touching had been established that Hughes told Allen several times that he would not be sharing the information they talked about. Hughes specifically stated once that he would not share information with "people," while several times he said he would not share information with Allen's mom and dad or with his wife. Hughes also told Allen the only way he would fail the polygraph test is if he touched the children for a sexual purpose.

12

After that point, Allen admitted he got aroused when he touched the girls. Hughes again said that he would not be talking to Allen's mom and dad or his wife, and Allen admitted there was no need in him taking the test, stating, "Everybody probably knew I touched them anyway," and that touching occurred, perhaps unintentionally at first, but later, intentionally.

In *Harty*, we addressed the situation of the effect of an allegedly improper promise on the voluntariness of a confession. The allegedly false representation there was an interviewer's statement that he would only disclose the accused's statements to the accused's therapist. *Harty*, 229 S.W.3d at 851. We determined in *Harty*, "The promise in this case is not such as would be likely to influence the defendant to speak untruthfully." *Id.* at 856.

We find *Harty* persuasive on this point. As was true with the defendant in *Harty*, Allen "did not have anything to gain by making false statements." *Id.* Falsely inculpating himself, even if that information was not shared with Allen's family members, would clearly be against his interest if disclosed to authorities. And, Allen admitted to Stiles, the investigating officer who had earlier interviewed Allen and who attended the last portion of Allen's interview with Hughes, that he touched the girls when he had the opportunity.

By determining that Allen's statements made during his interview with Hughes were admissible, the trial court implicitly determined that the statements were not involuntary and that Hughes's promises of confidentiality did not influence Allen to speak untruthfully. Based on this record, we cannot conclude that the trial court abused its discretion in making those determinations and thus admitting Allen's recorded interview with Hughes.

We overrule Allen's first issue.

13

**III.    Legal Sufficiency**

In his second and third issues, Allen challenges the sufficiency of the evidence to support his convictions for indecency by sexual contact and aggravated sexual assault of a child, respectively.  Because the conviction addressed in this appeal was only for indecency by sexual contact of L.C., we do not address Allen's third issue.

**A.    Standard of Review**

"We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017).  "In performing our sufficiency review, we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder." *Id.* "We resolve inconsistencies in the evidence in favor of the verdict." *Id.* "We determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.*

"We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Bittick*, 707 S.W.3d at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

**B.	Analysis**

The indictment alleged that Allen engaged in sexual contact with L.C. by touching her genitals.  As relevant here, a person commits the offense of indecency with a child, "if, with a child younger than 17 years of age, . . . the person . . . engages in sexual contact with the child."  TEX. PENAL CODE ANN. § 21.11(a)(1).  "[S]exual contact" includes, "if committed with the intent to arouse or gratify the sexual desire of any person[,] . . . any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child."  TEX. PENAL CODE ANN. § 21.11(c)(1).

Allen complains of the sufficiency of the evidence in two respects:  (1)  he "never conceded to any sort of intentional touching," and (2) the testimony establishing that the committed indecency was "incapable of belief."

L.C. testified that Allen touched her private part with his hand on the outside of her clothes.  She said it happened on a Monday night when the women of the church were meeting.  L.C. and another girl were with Allen, and he told them to be quiet.  As Allen touched her, L.C. heard her granny and the other girl's mother calling for them.  Allen told the other girl to run out the front, but he told L.C. to go out the back through the kitchen.  L.C. said she did not tell her granny right then because she was afraid her granny would not believe her.  Instead, she told her older sister.  L.C. told her grandmother about a week later.

As recounted above, Allen himself admitted several times during his interview with Hughes to touching the girls, though numerous times he denied that he touched them in any sexual manner.  While Allen never explicitly stated during his interview with Hughes that he

15

touched the girls with the intent to arouse or gratify himself, Allen did admit that he touched the girls intentionally and that he was "pretty sure" he got aroused when he touched them.

Although Allen complains on appeal that he never conceded intentional touching, his intent need not be established through direct evidence. "By its nature, a culpable mental state must generally be inferred from the circumstances." *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). And, because "[w]e cannot read an accused's mind, . . . we must infer his mental state from his acts, words[,] and conduct." *Id.* Moreover, Allen's self-serving statements regarding his intent need not be considered at all. "The testimony of a child victim alone is sufficient to support a conviction for . . . indecency with a child." *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd) (citing TEX. CODE CRIM. PROC. ANN. art. 38.07).

As regards Allen's assertion that he never conceded intentionally touching the girls, it is apparent from the trial court's judgment of guilt that it resolved any conflicts in the evidence in favor of the victims. A rational trier of fact could have found the intent element beyond a reasonable doubt without Allen's admission on this point.

Allen's second argument on this issue invites us to re-evaluate the credibility of the evidence. Under the applicable standard of review stated above, we are prohibited from doing so. *See Bohannan*, 546 S.W.3d at 178.

Viewing all the evidence in the light most favorable to the trial court's verdict of guilt, we conclude that a rational trier of fact could have found the essential elements of indecency with a child beyond a reasonable doubt.

We overrule Allen's second issue.

## IV.     Extraneous-Offense Evidence

In his fourth issue, Allen contends the trial court reversibly erred in admitting extraneous-offense evidence, specifically, A.H.'s testimony accusing him of inappropriate sexual conduct.

### A.     Standard of Review and Applicable Law

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Irsan*, 708 S.W.3d at 616 (quoting TEX. R. EVID. 404(b)(1)).  "But '[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'"  *Id.* (alteration in original) (quoting TEX. R. EVID. 404(b)(2)).  "That said, 'a court may exclude' otherwise admissible evidence 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.'" *Id.* (quoting TEX. R. EVID. 403).

"One well-established rationale for admitting evidence of uncharged misconduct is to rebut a defensive issue that negates one of the elements of the offense."  *Id.* (quoting *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009)).  "That is, 'a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact.'"  *Id.* (quoting *De La Paz*, 279 S.W.3d at 343).  "Further, the defendant's opening statement may open the door to the admission of

17

extraneous offense evidence to rebut opening statement defensive theories." *Id.* (citing *De La Paz*, 279 S.W.3d at 344–45).

"[A] trial judge's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *Id.* (alteration in original) (quoting *De La Paz*, 279 S.W.3d at 343). "So, too, is a ruling on the balance between probative value and the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343). "[W]e presume that probative value outweighs prejudicial value 'unless in the posture of the particular case the trial court determines otherwise.'" *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g)). "Accordingly, as long as the judge's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the ruling will be upheld." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343–44). "Further, if the trial judge's ruling is correct on any applicable legal theory, the ruling will stand." *Id.* (citing *De La Paz*, 279 S.W.3d at 344).

Specifically relevant to trials on charges of sexual offenses against a child, the Legislature has limited the prohibitive effect of Rules 404 and 405 of the Texas Rules of Evidence on the admission of separate sexual offenses against another child. When the charged offense is indecency with a child, notwithstanding Rules 404 and 405, "evidence of prior sexual assaults may be admitted 'for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.'" *Bradshaw v. State*, 466 S.W.3d 875, 882 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b)). "This broad allowance for admission

is limited by Rule 403's balancing test, which permits admission of evidence as long as its probative value is not substantially outweighed by its potential for unfair prejudice." *Id.* (citing TEX. R. EVID. 403). "In reviewing the trial court's admission of this evidence for an abuse of discretion, we recognize that the amendments to Article 38.37 reflect the stated intent to remove the propensity bar to the admissibility of certain evidence." *Id.*

With respect to extraneous conduct, a trial court must consider the following factors in conducting a Rule 403 balancing test:

(1)     how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2)     the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way;"

(3)     the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and

(4)     the force of the proponent's need for this evidence to prove a fact of consequence, *i.e.*, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Irsan*, 708 S.W.3d at 617 (quoting *De La Paz*, 279 S.W.3d at 349); *see Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.).

**B.     Analysis**

From his opening statement, Allen's counsel urged a defensive theory that

all of these allegations came out as a result of a dispute between a couple of families at the church. Nothing came up before that. It was a fight between Mr. Allen's wife and another member of the church. All the victims are related to this

19

church member. All of these allegations came out after this physical altercation broke out at the church.

Allen's counsel questioned each of the victims and the one mother who testified about the dispute between the families at the church or the familial relationship between the victims. Each of those witnesses testified before the State called A.H. as a witness.

Over Allen's Rule 403 and 404(b) objections, A.H. testified that, "[a]bout five" times, starting when she was eleven, Allen touched her inappropriately. A.H. said the first time was on an occasion when she was sleeping in the bed with Allen, his wife, and three more of his children. A.H. said Allen took off her underwear, contacted her vagina with his hand, and tried to insert himself inside her. A.H. said that caused "a lot of pain and pressure."

A.H. recounted another time when she was sleeping on the floor in her sister's room. She said Allen came and got her and took her to where he was laying and then tried to insert himself in her. Yet another time, A.H. said, he tried to insert himself again, and it was really, really painful.

A.H. said she did not tell anyone about Allen's actions at that time because she was embarrassed. She told her boxing coach seven years later, and then her stepdad, a detective, and eventually her mom. After that point, Allen's family members stopped talking to her. She later found out that other girls had made outcries against Allen, as well. A.H. did not know his other victims.

While Allen denies that his trial tactics amounted to a defensive theory of "fabrication," on this record, we conclude the trial court could have rationally determined that he urged a fabrication defense during trial and further determined that A.H.'s testimony was highly

20

probative in contesting that point. We conclude that the trial court's determination to admit A.H.'s testimony regarding Allen's extraneous sexual offenses against her was within the zone of reasonable disagreement. *See* TEX. R. EVID. 404(b)(2); TEX. CODE CRIM. PROC. ANN. art. 38.37 (Supp.); *Irsan*, 708 S.W.3d at 616.

Further, Allen's arguments on appeal ignore the existence of Article 38.37 of the Texas Code of Criminal Procedure. While admission of extraneous sexual offenses against a child must still be governed by a Rule 403 balancing test, *Bradshaw*, 466 S.W.3d at 882, this case presents exactly the situation the Legislature anticipated in passing Article 38.37.

Under the considerations of the four-point Rule 403 balancing test that must be employed in entering evidence under Article 38.37, again the trial court could rationally conclude that A.H.'s testimony was highly probative against Allen's defensive theory that the victims's recounts of his actions against them were fabricated. The fact that A.H. claimed he attempted to engage in sexual contact and sexual assault upon her when she was eleven years old is especially probative of Allen's propensity to sexually assault children. The trial court could have made certain inferences about Allen's behavior based on A.H.'s testimony. Those inferences would not have been irrational, as A.H.'s testimony and the circumstances of Allen's offenses against her were rationally related to the offenses he committed against the other victims in the relative ages of the victims, Allen's methods of assault, and his tendency to act even when others were present. The time the State spent developing this evidence with A.H. was comparable to that spent with another of the victims and not disproportionate to the remainder of the time the State spent developing its case. And, given Allen's suggestion in his opening statement that the

21

accusations against him were fabricated in retaliation for a dispute at the church, the trial court could rationally conclude that the need for the evidence was substantial to disprove that defensive theory.

On this record, we conclude the trial court did not abuse its discretion in admitting evidence of Allen's extraneous acts of sexual misconduct against A.H.

We overrule Allen's fourth issue.

## V.     Conclusion

We affirm the trial court's judgment.


Jeff Rambin
Justice

Date Submitted:     April 16, 2025
Date Decided:       June 30, 2025

Do Not Publish

22